UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 ROBERTO COIN, INC.,

                     Plaintiff,              **MEMORANDUM & ORDER**
                                             18-CV-4045(EK)(ST)

               -against-

 JOSEPH GOLDSTEIN and KINGS STONE US,
 LTD.

                     Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          This case arises out of the relationship between

plaintiff Roberto Coin, Inc. ("RCI"), a jewelry designer, and

defendants Joseph Goldstein and his company, Kings Stone US,

Ltd.  Goldstein and Kings Stone supplied RCI with a gemstone

they called "black jade" for a time.  After RCI stopped sourcing

black jade from Kings Stone and found a new supplier, Goldstein

contacted a number of stores selling RCI jewelry and disparaged

RCI's stones.  Both sides now claim the other is liable for

false advertising, among other claims.

          RCI sued first, asserting that the Defendants made

"flatly false" statements to induce RCI's customers to drop

RCI's new products in favor of Goldstein's, in violation of the

Lanham Act.  (For example, RCI alleges that Goldstein told one

of RCI's customers that RCI's stones were to real black jade as

cubic zirconia is to diamond.)  RCI claimed, in addition, that Goldstein and Kings Stone infringed RCI's trademarks by using photographs of Roberto Coin jewelry and RCI's logo in Kings Stone's advertising after RCI terminated the relationship.  RCI also brought certain state-law claims.

Kings Stone countersued RCI (also under the Lanham Act), alleging that after dropping Kings Stone, RCI made false claims about (a) the gemological content of the stones from its new supplier and (b) whether those stones had been "certified" by a laboratory.  Kings Stone also brought third-party claims against Roberto Coin (the founder of RCI himself, after whom RCI is named), alleging Lanham Act and related state-law claims.

Several motions are pending.  RCI moves for summary judgment against Goldstein on each of RCI's affirmative claims. RCI and Roberto Coin also move to dismiss Kings Stone's counterclaims and third-party claims, respectively, on the basis that Kings Stone has been unrepresented for an extended period and cannot proceed without counsel.  Goldstein is now proceeding *pro se* and has not submitted a formal motion for summary judgment.  Nevertheless, I construe his letter of April 13, 2020 (ECF No. 137) as a motion for summary judgment on RCI's claims, as discussed below.

For the reasons that follow, I grant RCI's and Roberto Coin's motion to dismiss Kings Stone's counterclaims and third-

party claims for failure to prosecute; I deny without prejudice
RCI's motion for default judgment on its claims against Kings
Stone; I grant RCI's motion for summary judgment in part and
deny it in part; and I grant Goldstein's motion for summary
judgment in part and deny it in part.

## I. Background

RCI filed a Statement of Material Facts under Local
Rule 56.1 in support of summary judgment; neither defendant,
however, filed the required counterstatement.  The following
factual recitation is drawn from the uncontested evidence
identified in RCI's Rule 56.1 Statement and also, given
Goldstein's *pro se* status, the Court's review of the evidentiary
record, including Goldstein's deposition testimony.[1]  Given the
cross-motions, I consider each motion independently and view all
facts in the light most favorable to the non-moving party.
*Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

---

[1] Because Goldstein is proceeding *pro se*, the Court has undertaken a
searching review of the underlying record evidence submitted by the parties.
*See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)
(district court has discretion not to apply Local Rule 56.1 to a *pro se*
party's failure to file a counter-statement, and review the record *de novo*);
*Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)
(district court may, in its discretion, opt to "conduct an assiduous review
of the record" where one of the parties has failed to file the 56.1
statement).

A.    **Factual Background**

1.    Kings Stone Supplies Stones to RCI

The relationship between RCI and Kings Stone began in 2012.  *See* Declaration of CKC Jewelry Company Managing Director Philip Grima ("Grima Decl.") ¶ 3, ECF No. 138-13.  Goldstein met with Roberto Coin to say that he had obtained access to a form of black amphibole jade that (according to Goldstein) was previously unknown.  *See* Excerpts from Goldstein Deposition ("Goldstein Dep.") 39:19, 135:12, ECF No. 138-29.[2]  Mr. Coin expressed interest.

Beginning "in or around May 2013," CKC Jewelry Company, the RCI affiliate that manufactures Roberto Coin jewelry ("CKC"), placed "significant orders" for Kings Stone's gemstones.  Grima Decl. ¶ 3.  The stones were to be used in RCI's new "Black Jade" collection.  *Id.*  The parties did not enter into a written contract in connection with the purchase and sale of these stones, apart from the exchange of purchase orders or invoices.

"Several months" after it began supplying stones to CKC, Kings Stone provided RCI with an analysis prepared by the National Gem Testing Center ("NGTC") — a gemstone testing

---

[2] In the pleadings, Kings Stone asserts that its access to this strain of black jade was "exclusive."  *See* Answer with Counterclaims and Third-Party Complaint ("Defendants' Answer") ¶ 11, ECF No. 15.  This claim is unsupported, however, in the evidentiary record.

laboratory based in China — stating that the mineral content of its stones was "black amphibole jade."  *Id.* ¶ 4; *see also* ECF No. 138-14 (certifications provided by Kings Stone).

Soon thereafter, RCI communicated its dissatisfaction with multiple aspects of Kings Stone's performance.  *See* ECF No. 138-15 (emails dated August 27, 2013 to October 25, 2013 between Goldstein and CKC).  CKC complained about the pace of deliveries and the quality and condition of Kings Stone's product.  *Id.*  By mid-2014, CKC and RCI decided to end the relationship with Kings Stone.  Grima Decl. ¶ 6.  Thereafter, RCI obtained a new supplier and continued to market the "Black Jade" collection. *See id.*; *see also* Declaration of RCI President Peter Webster ("Webster Decl.") ¶ 25, ECF No. 126-15.

2.    Goldstein Uses RCI's Trademark

About a year and a half after the split with Kings Stone, RCI discovered that the Defendants were using photographs of RCI jewelry alongside RCI's trademarked logo, as well as the name "Roberto Coin," on Kings Stone's Instagram feed.  *See* Webster Decl. ¶ 9; ECF No. 138-4 (RCI trademarks); ECF No. 138-5 (Instagram posts).  Goldstein acknowledged this use, though he claimed that the Instagram images were posted only for a short period.  *See* Rule 30(b)(6) Deposition of Joseph Goldstein as

representative of Kings Stone ("Kings Stone Dep.") 221:7-17, ECF
No. 138-36.

In a PowerPoint presentation.  Goldstein Dep. 133:22-134:10,
356:14-357:15.  He claims that he believed RCI "knew about" and
"was okay" with this: "I know 100 percent for sure they [RCI]
have received [the PowerPoint presentation], and they knew about
it, so it was okay when I disseminated that information."  *Id.*
at 356:20-22.

In January 2016, RCI's counsel sent Goldstein a letter
demanding that he remove the images from Kings Stone's Instagram
feed and "stop any such conduct for the future."  ECF No. 138-5
(RCI cease-and-desist letter).  She wrote that Goldstein was not
lawfully authorized to use Roberto Coin's photographs or
trademarks, and that there was "no evidence that the ROBERTO
COIN jewelry shown in your Instagram page are made with your
jade."  *Id.*  Instagram (not Goldstein) ultimately removed the
posts at issue.  Kings Stone Dep. 221:11-17.

### 3.   Goldstein Contacts RCI Retailer Borsheims

In November 2017, Goldstein emailed Borsheims, a
jewelry retailer based in Omaha, Nebraska that sold RCI products
(including the Roberto Coin "Black Jade" collection).  ECF No.

138-7 at 13.[3]   In his initial entreaty, Goldstein did not mention
RCI; instead, he simply requested that Borsheims sell jewelry
incorporating Kings Stone's black jade.   *Id.*   Goldstein
described Kings Stone's black jade as "exclusively certified by
the china NGTC and the prestigious US based AGL as Black jade."
*Id.* (capitalization as in original).   A Borsheims buyer wrote
back to say that Borsheims "would not be interested" in
purchasing Kings Stone's product.   *Id.*

　　　　Approximately five months later, Goldstein emailed
Borsheims again, this time pretending to be a customer.
Goldstein said he was looking for a "gift for a jade
connoisseur."   *Id.* at 9 (email dated April 8, 2018).   He
expressed interest in a specific item — "the Roberto Coin 18K
Rose Gold & Diamond Black Jade 3 Shank Ring" — and asked
Borsheims to provide him with "a gem certificate that verifies
its authenticity as genuine black jade."   *Id.*

　　　　Borsheims' employee wrote back to say that she had
contacted RCI, and that "while they do not have official
certificates of authenticity for their jade gemstones, they
provided me with the attached card detailing the certification
of the jade along with further details."   *Id.* at 8 (email dated
April 9, 2018).   The "attached card" contained photographs of

---

[3] Citations to ECF Nos. 138-7 and 138-8 refer to the pagination
generated by the Court's ECF docketing system.

RCI jewelry and the following text: "The most fascinating black amphibole jade, 100% natural identified and certified by China's National Gemstone Testing Center (NGTC) is the protagonist of the homonymous 'Black Jade' collection."  *Id.*; *see also* ECF No. 15-5 (showing attached card).

One day after receiving this card, Goldstein emailed Borsheims again.  He referred to the Black Jade ring about which he had previously inquired, writing that it:

> does not come with any certification as to its authenticity that the black jade is genuine.  If there is no certification available, then legally you cannot claim or advertise that it is black jade, no less then [sic] claiming a cubic zirconia being a real diamond . . . .  My black jade comes with full certification by 3 major Gemological Labs.  When dealing with my certified black jade stones you are assured of the highest quality and no reputational risk to your company by selling non certifiable black jade.  The real black jade jewelry companies are doing great with our line with sales exceeding the best projections.

ECF No. 138-7 at 12.  Goldstein followed up the next day with an email to another Borsheims employee, referring to the same ring and stating that "[w]e have asked Roberto Coin directly numerous times for confirmation of the black jade authenticity and we have not received any response."  *Id.* at 7.

Eleven minutes after this last email, Goldstein threatened Borsheims with legal action.  He stated that Kings Stone was being "effected by the Fake black jade being advertised by various venders."  *Id.* at 11 (global [sic]).  He

8

wrote that he would be "filing for class action status on this matter to protect [his] business and the consumers being misled by false advertising." *Id.* He concluded by saying that Borsheims must "take remedial action otherwise we will include your company in this [action] since we have legally notified you. . . . And yes even borsheims has to be held accountable." *Id.*

Goldstein's outreach apparently had its intended effect. On April 16, 2018, Borsheims emailed Peter Webster, the president of RCI, to say that they were "removing the black jade" offerings from Borsheims' website. *Id.* at 2.

4. Communications With Other RCI Retailers

Goldstein also contacted other retailers carrying RCI's Black Jade collection. He emailed Macy's, Neiman Marcus, and Saks Fifth Avenue in early April 2018. *See* ECF No. 138-8. In each case, he sought confirmation that the RCI black jade they carried was certified. *See* Goldstein Dep. 308:7-309:7.

For example, the Defendants produced an April 4, 2018 email exchange between Goldstein and a Saks Fifth Avenue employee named Shraddha Patel. *See* ECF No. 15-4. Goldstein's initial inquiry is not included, and may have occurred by telephone.[4] Ms. Patel responded by email, however, writing "I

_____

[4] Goldstein did acknowledge that he posed as a customer in his initial approach to Saks. Goldstein Dep. 290:15-21.

just spoke to the representative from Roberto Coin and she advised me that the black amphibole jade they use is 100% natural identified and certified by China's National Gemstone Testing Center." ECF No. 15-4.

Goldstein wrote back, pressing for "the certificate confirming this. I really want [to] finalize the purchase but I need to certificate." *Id*. Ms. Patel responded by attaching a copy of the same card that RCI sent to Borsheims (which stated that the black amphibole jade in Roberto Coin's collection was "100% natural identified and certified by China's National Gemstone Testing Center"). *Id.*

Goldstein also communicated during this time with Saks's parent corporation, Hudson's Bay Company, telling an employee there that RCI's black jade was "not . . . authenticated or certified as advertised." ECF No. 138-8 at 11 (email dated April 17, 2018). Goldstein's exchanges with Macy's and Neiman Marcus were similar.

After endeavoring to obtain a copy of RCI's certification from these retailers, Goldstein emailed them to say he would be filing a lawsuit against RCI. These emails did not refer explicitly to RCI's black jade as "[f]ake," as Goldstein's email to Borsheims had. Instead, Goldstein primarily referred to RCI's jewelry as "non-authenticated." Goldstein wrote: "I am part of a group of gemstone dealers

selling genuine and certified black jade, that are in the
process of filing a class action lawsuit against Roberto coin
for selling non authenticated black jade." *Id.* at 2 (email
dated April 10, 2018 from Goldstein to Hal Lawton of Macy's);
*id.* at 8 (email dated April 13, 2018 from Larry Pelzel of Neiman
Marcus to Eric Ford and Peter Webster, forwarding Goldstein's
email).

Goldstein also referred to RCI's black jade as a
"questionable product" in communications with Macy's and Neiman
Marcus, in light of the authentication issue.  Specifically, he
said he was letting the retailers know about his lawsuit as a
"courtesy" so that they could "take remedial action . . . and
remove any questionable product that cannot be authenticated."
*Id.* at 2, 8.

At his deposition, Goldstein acknowledged approaching
"every customer that was advertising the black jade."  Goldstein
Dep. 308:11-12.  He "contacted them for certification, and they
said it is certified, so we pressed on, 'Please give us the
information, on what basis you're saying that it's certified.'"
*Id.* at 308:12-16.  Goldstein enlisted help in this effort: he
hired an assistant through a platform called Fiverr to help him
identify retailers selling RCI's black jade.  *Id.* at 329:3-10.
Goldstein did not recall the total number of RCI retail

customers he contacted, but testified that it was a "huge amount of communication."  *Id.* at 369:21-22.

Goldstein also emailed RCI directly during this period, accusing it of relying on Kings Stone's "black jade" certification despite sourcing stones from a new supplier.  *See* ECF No. 138-8 at 6 (email dated April 4, 2018 from Goldstein to Roberto Coin accusing RCI of "using the NGTC black jade certificates that was [sic] made for goods purchased from Kings Stone" in connection with the sale of later-acquired stones). Goldstein described this conduct as "illegal" and "fraudulent." *Id.*

5.  Retailers Remove Their Offerings of RCI Black Jade

As noted above, Borsheims informed RCI of its intent to pull the Black Jade offerings from its website on April 16, 2018.  In addition to Borsheims, Macy's and Saks Fifth Avenue also stopped selling the Black Jade collection.  Webster Decl. ¶ 18.  Some of this product was returned to RCI: for example, Saks, Borsheims and Bloomingdales alone returned jewelry valued at more than $380,000 from the Black Jade collection.  ECF No. 126-13.

At least one jewelry retailer apparently understood Goldstein to be challenging the *authenticity* of the gemstones in RCI's Black Jade collection, as opposed to merely questioning whether RCI had obtained an *authentication* from a laboratory.

On April 13, 2018, after receiving Goldstein's emails, Larry Pelzel of Neiman Marcus wrote to RCI President Peter Webster, saying: "This gentleman is inquiring [as] to the Authenticity of the black jade used in Coin's jewelry. . . . Let's discuss." ECF No. 138-8 at 8 (email dated April 13, 2018 from Pelzel to Webster, forwarding an email from Goldstein).

   6.   RCI Obtains Various Gemological Analyses

       RCI contends that there is no industry-wide "certification" for the "authenticity" of black jade, Memorandum of Law ("Pl. Br.") at 16, ECF No. 126-19, because "black jade" is not a scientific category.  *See id.* at 5 (citing Report of Donald A. Palmieri ("Palmieri Rep.") at 7-9, ECF No. 138-18). Instead, the term "jade" is generally used in the industry to describe two different but related minerals, nephrite and jadeite.  Palmieri Rep. at 7-9.  Thus, RCI claims, its use of the term "black jade" cannot constitute false advertising.  Pl. Br. at 16.

       Despite this view, RCI did work to obtain certifications from various gemological labs between 2014 and 2018.  These certifications include one from the Hong Kong Gems Laboratory (dated August 15, 2014) certifying that RCI's gemstones were comprised of "Natural Amphibole Material"; Gübelin Gemlab's certification (dated October 17, 2014) that RCI's gemstones contained "amphibole and other minerals"; an

13

NGTC certification (dated April 24, 2018) that the tested stones were "Black Amphibole Jade"; and a certification from the Gemological Testing Laboratory (dated May 3, 2018) attesting that RCI's stones were "Black Nephrite Jade." *See* ECF No 138-16 (lab analyses).

As the litany above indicates, however, RCI obtained the latter two certifications — including the one from NGTC — *after* RCI apparently emailed the card promoting its stones as "[t]he most fascinating black amphibole jade . . . . 100% natural identified and certified by China's National Gemstone Testing Center (NGTC)" — to Saks on April 4, 2018, ECF No. 15-4, and Borsheims on April 9, 2018. ECF No. 138-7 at 8. Defendants alleged that RCI obtained the NGTC certification by submitting a stone obtained from Kings Stone, rather than one obtained from its new supplier. Answer and Counterclaim ¶¶ 54-55. Neither defendant, however, has adduced evidence in support of this allegation.

     7.   <u>Goldstein's Lawsuit and Additional Communications</u>

Goldstein did ultimately file a lawsuit against RCI in New York State Supreme Court in November 2019, though he voluntarily dismissed it in December 2019. ECF No. 138-31 (demand for complaint in New York Superior Court action); ECF No. 138-32 (Notice of Discontinuance).

In addition, after Kings Stone filed its counterclaims in this case, Goldstein sent an email touting those allegations to the "base" of people in his email address book — "basically industry wide." Kings Stone Dep. 61:3-8. The recipients — over a hundred in total — included various jewelry-industry players: newsletters and magazines, trade associations, and additional retailers. *See* ECF No. 138-10 (emails dated December 20-27, 2018). In the email, Goldstein characterized his allegations against RCI as "eerily similar to the GIA scandal." *Id.*

The parties dispute what to make of this simile. RCI says that Goldstein's reference was to a "situation . . . in which the Gemological Institute of America, a preeminent gemological testing laboratory, was investigated by federal authorities for criminal activities and sued by a jewelry purchaser for allegedly taking bribes in exchange for upgrading reports on diamonds." Pl. Br. at 12; *see also* Webster Decl. ¶ 19. Goldstein testified at deposition, however, that he was referring only to the misclassification of gemstones. In his recollection, the GIA scandal was about "fraudulent certification[s] classifying gemstones [as] what they were not." Kings Stone Dep. 50:11-15. He testified that he was not aware of the bribery aspect of the GIA scandal. *Id.* at 52:6-18.

**B.   Procedural History**

RCI commenced this action in July 2018.  It alleges violations of the Lanham Act, 15 U.S.C §§ 1125 and 1114, for deceptive advertising, unfair competition, and trademark infringement.  *See* Complaint ("Compl."), ECF No. 1.  RCI also brings pendent state-law claims for defamation, trade disparagement, tortious interference with business relationships, deceptive acts and practices under New York General Business Law Section 349, and trademark infringement. *Id.*  Defendant Kings Stone (but not Goldstein himself) filed counterclaims against RCI for deceptive advertising under the Lanham Act, tortious interference with business relationships, unfair competition, and deceptive acts and practices under New York General Business Law Sections 349 and 350.  *See* Defendants' Answer ¶¶ 62-90.  Kings Stone also named Roberto Coin (the individual) as a third-party defendant, alleging the same claims against him personally.  *Id.* ¶ 7.

RCI now moves for summary judgment on all its affirmative claims.  RCI and Roberto Coin move for dismissal of Kings Stone's counterclaims and third-party claims for failure to prosecute under Rule 41 of the Federal Rules of Civil Procedure on the ground that Kings Stone (as a corporate entity) may not proceed *pro se*.  *See* Pl. Br. at 38.  They also seek a

default judgment under Rule 55 on RCI's claims against Kings Stone on the same basis. *See id.* at 36.

Furthermore, as I noted above, I construe one of Goldstein's submissions as a motion for summary judgment on RCI's complaint in its entirety. Goldstein filed a letter-response in opposition to RCI's motion for summary judgment. ECF No. 137 (letter dated April 13, 2020, in Response to RCI's Motion for Summary Judgment, Default, and Dismissal). There, Goldstein asked the Court to "grant [him] an additional request for summary judgment." *Id.* He also referred the Court to an earlier letter in which he had raised certain defenses — most prominently, that the statements about which RCI complains were true. *See* ECF No. 121 (letter dated February 14, 2020 from Joseph Goldstein requesting Rule 11 sanctions).[5] I construe Goldstein's letter of April 13, 2020 as a motion for summary judgment on Plaintiff's claims. Kings Stone did not submit a motion for summary judgment, either affirmatively or defensively.

---

[5] It is not clear that the letter Goldstein styled as a "Rule 11 Motion" is actually that. The letter states that *if* the Court were to determine that Plaintiff committed a fraud, Goldstein would then ask the Court to sanction Plaintiff. Therefore, I do not consider it at this point. *See Bryant v. Am. Embassy*, No. 88-CV-0294, 1988 WL 68740, at *1 (S.D.N.Y. June 16, 1988) (Rule 11 motion has to state a current basis on which to impose sanctions). In any event, Rule 11(c) permits a court to award "reasonable expenses, including attorney's fees" only to a "prevailing party" and only if such an award is "warranted." Fed. R. Civ. P. 11(c)(2). Therefore, I decline to review the motion until the completion of the case. *See Kleiman v. Chertoff*, No. 3-CV-3829, 2007 WL 9706519, at *9 (E.D.N.Y. July 10, 2007).

## II. Legal Standard

Summary judgment is appropriate if the record demonstrates that "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56.  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Lovejoy-Wilson v. NOCO Motor Fuel*, *Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[6]  The moving party bears the burden of showing that it is entitled to summary judgment.  *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The non-moving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

Though he was represented by counsel at the time the Complaint and his answer were filed, Goldstein is now proceeding

---

[6] Unless otherwise noted, when quoting judicial decisions this order omits all alterations, citations, footnotes, and internal quotation marks.

*pro se*.  When considering a dispositive motion made by or against a *pro se* litigant, courts generally afford the litigant "special solicitude," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), and construe all submissions by the *pro se* defendant "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). Nevertheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002).

### III. Discussion

#### A.   Kings Stone's Failure to Prosecute

Kings Stone asserted counterclaims against RCI for false advertising under the Lanham Act and related state-law claims, as noted above. *See* Defendants' Answer.  Goldstein did not bring any affirmative claims himself. *Id.*  Kings Stone also brought third-party claims against Roberto Coin personally. *Id.* ¶ 7.

Kings Stone's counsel withdrew after the filing of its answer, and a corporation cannot represent itself. *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202 (1993) ("A corporation may appear in the federal courts only through licensed counsel."); *see also Mendelka v. Penson Fin. Servs., Inc.*, No. 16-CV-7393, 2017 WL 1208665, at *5 (S.D.N.Y. Mar. 31, 2017) (dismissing unrepresented corporation's

19

claims for failure to prosecute).  Goldstein, who is not a licensed attorney, cannot represent his codefendant.

In evaluating whether and when to dismiss a corporate party's claims for failure to secure representation, courts consider: (1) the duration of the plaintiff's failures, (2) whether the plaintiff had received notice that further delays would result in dismissal, (3) whether the defendant is likely to be prejudiced by further delay, (4) whether the need to alleviate court calendar congestion outweighs the need to protect a party's right to due process and a fair chance to be heard, and (5) the efficacy of lesser sanctions.  *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 193-94 (2d Cir. 1999).

Kings Stone's first attorney, Solomon Klein, moved to withdraw in December 2018.  In January 2018, Magistrate Judge Tiscione granted Klein's motion and warned Goldstein (who is Kings Stone's sole employee and CEO) both in person and in writing that if the entity did not secure new representation, a default judgment could issue.  *See* ECF Nos. 41, 42.  Judge Tiscione reiterated that warning when Kings Stone had not engaged new counsel by March 2019.  *See* ECF No. 65.

Kings Stone's second attorney, Boris Kogan, appeared in April 2019, ECF No. 70, and a third attorney, Thomas Hamilton Burt, joined him in November 2019.  ECF No. 96.  Both of these attorneys withdrew in December 2019.  ECF Nos. 98, 99.  Judge

Tiscione warned Goldstein that he was not willing to further delay the case if Goldstein did not retain another attorney. *See* ECF No. 101.  No attorney appeared on Kings Stone's behalf thereafter.  Kings Stone has now had more than nineteen months to find new counsel following the withdrawal of its second and third attorneys.  In the meantime, Kings Stone failed to produce its expert witness for a scheduled deposition on January 16, 2020, *see* ECF Nos. 138-53, 138-54, and both defendants were absent at a scheduled conference before Judge Tiscione shortly thereafter.  *See* ECF No. 113.

The protracted delay in this case is more than sufficient to warrant dismissal.  *See, e.g.*, *Mendelka*, 2017 WL 1208665, at *5 (dismissing for failure to prosecute after six-month delay in retaining counsel).  Given the passage of time, RCI would clearly be prejudiced by further delay.  Prejudice to a defendant may be presumed where a delay in prosecution is neither moderate nor excusable.  *See Dodson v. Runyon*, 957 F. Supp. 465, 470 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 917 (2d Cir. 1998).  The presumption arises "because delay by one party increases the likelihood that evidence in support of the other party's position will be lost and that discovery and trial will be made more difficult."  *Shannon*, 186 F.3d at 195.

Here, Kings Stone's neglect was not "moderate."  *See Maersk Line v. Phoenix Agro-Indus. Corp.,* No. CV-07-3169, 2009

WL 1505281, at *5 (E.D.N.Y. May 27, 2009) (dismissing defendant's counterclaim for failure to prosecute where it failed to obtain counsel for "several months").  Nor was it excusable, as Kings Stone has offered no persuasive explanation for its failure to obtain counsel.

Therefore, the motion is granted and Kings Stone's claims — both its counterclaims against RCI and its third-party claims against Roberto Coin — are dismissed.

## B.   RCI's Motion for Default Judgment Against King's Stone

RCI is seeking the entry of a default judgment on its claims against Kings Stone on the same basis — Kings Stone's failure to engage representation.

When a plaintiff seeks judgment against a defaulting defendant on the same claims it is litigating (in the same action) against an appearing defendant, the proper course is to postpone decision on the default motion until the case against the litigating party concludes.  *See, e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 414 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) ("More than 125 years ago, the Supreme Court held that when a defendant defaults in an action asserting joint liability, judgment should not be entered against the defaulting defendant until the matter has been resolved against the other defendants."); *Peralta v. Roros 940, Inc.*, No. 11-CV-6242, 2016 WL 1389597, at *1 (E.D.N.Y. Apr. 6, 2016) ("When one

22

defendant defaults in a multi-defendant case, the district court should not enter a final decree on the merits against the defaulting defendant alone."). This practice is intended to avoid inconsistent results. *See Sec. & Exch. Comm'n v. Williams*, 2013 WL 12290897, at *1 (D. Conn. Sept. 27, 2013) (Martinez, M.J.) ("[F]ederal courts, recognizing the potential for inconsistent judgments, have declined to grant a default judgment against one defendant until the matter has been adjudicated against them all."). RCI's motion for default judgment against Kings Stone is therefore denied without prejudice to its renewal upon resolution of RCI's case against Goldstein.

## C. RCI's Affirmative Claims

Plaintiff moves for summary judgment on its affirmative claims against Defendants for false advertising and trademark infringement under the Lanham Act, as well as state-law defamation and related tort claims. As noted above, I construe certain of Goldstein's letters as a cross-motion for summary judgment on the same claims. I grant RCI's motion in part and grant Goldstein's motion in part.

### 1. <u>False Advertising under the Lanham Act</u>

The gravamen of RCI's false-advertising claim is that Goldstein made a series of false statements, broadly disseminated to RCI's customers, to the effect that RCI was

"incorporating false or counterfeit gemstones into its jewelry."
Compl. ¶ 50.  RCI says this was "a devastatingly damaging
allegation against a jeweler known for the high quality of its
materials."  *Id.*  RCI seeks relief under the Lanham Act,
including monetary damages, attorneys' fees, and a "permanent
injunction preventing Defendants from attacking the
'authenticity' of the jade in Roberto Coin's black jade
jewelry."  *Id.* ¶ 55.

The Lanham Act establishes a claim against any person
who:

> in connection with any goods or services . . . uses in
> commerce any . . . false or misleading description of
> fact, or false or misleading representation of fact,
> which —
>
> (B)  in commercial advertising or promotion,
>      misrepresents the nature, characteristics, [or]
>      qualities . . . of . . . another person's goods,
>      services, or commercial activities.

15 U.S.C. § 1125(a)(1)(B).  "To invoke the Lanham Act's cause of
action for false advertising, a plaintiff must plead (and
ultimately prove) an injury to a commercial interest in sales or
business reputation proximately caused by the defendant's
misrepresentations."  *Lexmark Intern., Inc. v. Static Control
Components, Inc.*, 572 U.S. 118, 140 (2014).  The statute reaches
two types of misrepresentations: statements that are literally
false and those that are "impliedly" false.  *Time Warner Cable,
Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007).  In the

24

latter category are advertisements that, though they are "literally true," are nevertheless "likely to deceive or confuse customers." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001).

Additionally, to satisfy Section 1125's requirement that the false statements appear "in commercial advertising or promotion," RCI must show that the statements were disseminated broadly.  The "touchstone of whether a defendant's actions may be considered commercial advertising or promotion under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  The plaintiff must therefore produce "proof of widespread dissemination within the relevant industry" to prevail.  *Id*.  "Although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (collecting cases).

The communications that RCI invokes in support of its Lanham Act false-advertising claim fall into two broad (and perhaps overlapping) subcategories.  First, RCI flags communications in which Goldstein said (or implied) to retailers that RCI's black jade was fake or inauthentic.  *See, e.g.*, ECF

25

No. 138-7 at 11 (email dated April 11, 2018 from Goldstein to Borsheims discussing the impact that the sale of "Fake black jade" has on Goldstein's business); *id.* at 12 (email dated April 10, 2018 from Goldstein to Borsheims comparing the claim that RCI's stones contain black jade to a claim of "cubic zirconia being a real diamond," and referring to Kings Stone as one of "the real black jade jewelry companies" — a category that presumably excluded RCI).

Second, RCI seeks relief for Goldstein's various statements that RCI's stones lacked some form of certification or authentication. *See, e.g.*, *id.* at 12 (email dated April 10, 2018 from Goldstein to Borsheims stating that RCI black jade "does not come with any certification as to its authenticity that the black jade is genuine").

I consider below whether RCI has adduced sufficient evidence that these statements were (a) false (literally or impliedly) and (b) made in commercial advertising or promotion.

a.   Were Goldstein's Statements False?

As noted above, Goldstein stated — at various times and to various retailers — that RCI's stones were "Fake"; that they constituted a "questionable product"; and that calling them black jade was like calling "cubic zirconia . . . a real diamond."  He stated further that retailers of Roberto Coin's

26

jewelry "legally . . . cannot claim or advertise that it is black jade."

RCI has adduced sufficient evidence of these statements' falsity to survive summary judgment on this element of the Lanham Act. As to the accusation that Roberto Coin's gemstones constituted "Fake black jade," RCI's expert Palmieri attested that there is no scientifically established category of mineral called "black jade." Palmieri Rep. at 3. The most closely applicable mineral groups are nephrite and jadeite*, see id.*; and Nephrite belongs to the "amphibole" group of minerals. *Id.* RCI has produced certifications that its gemstones had, indeed, been authenticated as "amphibole" in August and October of 2014. *See* ECF No. 138-16 (Hong Kong Gems Laboratory certification and Gübelin Gemlab certification). Based on this certification, a reasonable jury could conclude that Goldstein's accusation was literally false.[7]

The alleged falsity of Goldstein's statements about authentication and certification is a murkier question at this point. Goldstein asserted that RCI's jewelry "does not come with any certification as to its authenticity that the black jade is genuine" (to Borsheims); that RCI's stones were "not . .

---

[7] RCI later produced certifications authenticating its stones as "Black Amphibole Jade" on April 24, 2018, *id.* (NGTC certification), and "Black Nephrite Jade" on May 3, 2018. *Id.* (The Gemological Testing Laboratory certification).

. authenticated or certified as advertised" (to Saks); and that RCI was "selling non authenticated black jade" (to Macy's and Neiman Marcus).  These statements were not literally false, as RCI did not (at the time) possess a certification expressly confirming that its stones were "black jade."  Given RCI's evidence that there is no established mineralogical category for "black jade," however, they could be found to be impliedly false.  That is, a jury might reasonably conclude that Goldstein was falsely implying the existence of such a category, and suggesting that RCI was "incorporating false or counterfeit gemstones into its jewelry," as RCI alleges.  Compl. ¶ 50. Indeed, at least one retailer seemed to understand the statement this way: Larry Pelzel of Neiman Marcus contacted RCI to say that Goldstein was questioning "the Authenticity of the black jade used in Coin's jewelry."  ECF No. 138-8 at 8.  This communication supports RCI's contention that Goldstein's statements could have caused a reasonable customer to believe that its black jade was somehow counterfeit.  *See Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992) ("Where, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers.").

Goldstein has suggested some rejoinders to this claim about authentication — that he asked RCI for evidence of a certification and did not receive a response; that he indicated as much to RCI's suppliers, thus disclosing the basis for his claims; and other responses.  But this question — namely, whether Goldstein's statements about authentication and certification were impliedly false — is, at this point, a question for a jury.[8]

RCI has also asked for summary judgment on *its* affirmative claims — that is, a judgment holding Goldstein liable for false advertising now, without a trial.  That judgment would be premature at this point because of (at least) the following two factors: (a) the implied-falsity issue is properly reserved for a determination by the finder of fact, and (b) the parties continue to dispute (at least implicitly) which

---

[8] Goldstein also made certain legal claims in his emails.  He told Borsheims, for example, that "[i]f there is no certification available, then legally you cannot claim or advertise that it is black jade."  ECF No. 138-7 at 12.  Goldstein's pronouncement on the legality of RCI's conduct is not, in itself, actionable; a layman's statements about the illegality of another party's conduct do not violate the Lanham Act absent a "clear and unambiguous ruling from a court or agency of competent jurisdiction" that the conduct *is* lawful.  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 731-732 (9th Cir. 1999); *see also Anthem Sports, LLC v. Under the Weather, LLC*, 320 F. Supp. 3d 399, 414-15 (D. Conn. 2018).  Nor are these statements "commercial," as that term is used in the Lanham Act.  *See, e.g.,* *Cartier Intern. AG v. Motion in Time, Inc*, No. 12-CV-8216, 2013 WL 1386975 at *2 (S.D.N.Y. 2013); *GeigTech East Bay LLC v. Lutron Elecs. Co.*, No. 18-CV-5290, 2019 WL 1768965, at *10-12 (S.D.N.Y. 2019).  The statements may be considered by a jury, however, to the extent they imply (as a factual matter) that RCI was misleading its retailers or other customers about the content of its stones.

stones RCI submitted to the various gemological labs to obtain its certifications.  The existing record does not definitively rule out the possibility that RCI commingled stones from Goldstein and its subsequent supplier, or definitively establish the provenance of the stones RCI submitted for evaluation.[9]  This will be an issue for the jury.

> b.   Were Goldstein's Statements Broadly Disseminated?

To constitute "commercial advertising," the statements must be "part of an organized campaign to penetrate the relevant market." *Fashion Boutique*, 314 F.3d at 57.  Widespread dissemination of the alleged misstatements is an essential element, as "businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action."  *Id.*

In evaluating the breadth of dissemination, courts in the Second Circuit consider the following factors: (1) the number of alleged statements; (2) to whom the statements were made; (3) where the statements were made; and (4) the size of the relevant market.  *Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 271 (E.D.N.Y. 2014) (citing *Fashion*

---

[9] For example, RCI's expert Palmieri reported that in 2018 he tested jewelry containing RCI black jade he purchased from Saks and Mason-Kay, Inc., as well as black jade that CKC directly provided to him.  *See* Palmieri Rep. at 15-16.  The record reveals nothing, however, about the prior provenance of the stones.

*Boutique*, 314 F.3d at 58); *Conte v. Newsday, Inc.*, No. 06-CV-4859, 2013 WL 978711, at *14 (E.D.N.Y. Mar. 13, 2013) (same).

Goldstein's statements to the various retailers were not identical. Thus, a threshold question is whether to consider those statements individually or in the aggregate when assessing the breadth of dissemination. *See Reed Const. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 410 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ("Before the Court can consider whether the statements were sufficiently distributed, it must answer a preliminary question: are the statements to be considered together or in isolation?"). I conclude that Goldstein's statements should be aggregated when assessing the breadth of dissemination, because they were made during a compressed time period (approximately three weeks in April 2018) and concerned similar subject matter (the authenticity and authentication of RCI's black jade). *See id.* at 409-11 (aggregating *ad hoc* statements by individual salespeople to individual customers because they were part of a coordinated campaign, "directed" by the defendant's management); *see also* 2 CALLMANN ON UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 5:16 (4th Ed. 2021) ("Where a number of separate, unique communications are made to individual customers, but these communications share the same competitive approach, a court may view the communications in the aggregate as a single advertising

campaign within the reach of the Lanham Act's ban on false advertising.").

Indeed, *Fashion Boutique* — a leading Second Circuit case on Lanham Act false advertising — displayed a willingness to aggregate fairly disparate statements, though it ultimately found that those statements were insufficiently disseminated (even after aggregation). *See Fashion Boutique*, 314 F.3d at 58 ("Even including the 'different line' statements, post-closing statements, and comments made to undercover investigators, Fashion Boutique has presented a total of twenty-seven oral statements regarding plaintiff's products in a marketplace of thousands of customers."); *see also LidoChem, Inc. v. Stoller Enters., Inc.*, 500 F. App'x 373, 374-82 (6th Cir. 2012) (aggregating various statements about the toxicity of plaintiff's product); *Apotex Inc. v. Acorda Therapeutics, Inc.*, No. 11-CV-8803, 2014 WL 5462547, at *4-5 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 823 F.3d 51 (2d Cir. 2016) (aggregating statements by defendant's sales representatives to different doctors).

Because the statements at issue here were made within a discrete time frame, and were consistent in substance and purpose, a jury could reasonably conclude that they constituted a single "campaign." They are therefore properly aggregated for purposes of assessing the breadth of dissemination at this stage.

32

Once aggregated, Goldstein's statements demonstrate sufficiently broad dissemination for a jury to find in RCI's favor on the Lanham Act claim.  Breadth of dissemination is typically measured as a fraction of the overall market.  *See, e.g.*, *Pro. Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722, 729 (S.D.N.Y. 2004), *aff'd*, 159 F. App'x 270 (2d Cir. 2005) (defining market as thirty-six customers and concluding dissemination to one customer out of thirty-six insufficient fraction to show an "organized campaign to penetrate the relevant market").  Focusing on the denominator of that fraction, it becomes important to define the relevant market.

On the one hand, the global market for fine jewelry is perhaps enormous.  *Chamilia, LLC v. Pandora Jewelry, LLC,* No. 04-CV-6017, 2007 WL 2781246, at *9 (S.D.N.Y. Sept. 24, 2007) ("While neither party has produced evidence of the precise size of the jewelry market or the number of potential jewelry retailers, it is clear that the market involves hundreds, if not thousands, of customers.").  And RCI itself notes that its "distribution network includes customer agreements with "boutique jewelers nationwide," in addition to the department stores referenced above.  Webster Decl. ¶ 6; *see also id.* ¶ 3 ("RCI sells its jewelry across forty-nine states, and Canada, the Caribbean, Mexico, and Central America.").

On the other hand, the market for name-brand, artistically produced luxury jewels is surely a discrete subset of that industry.[10]  RCI produced evidence, for example, that the five prominent department stores that Goldstein emailed accounted for "over 23% of RCI's gross profits on sales from the black jade collection" in themselves.  Pl. Br. at 21 (citing Webster Decl. ¶ 16).  Here, the size of the relevant market remains to be determined with precision at trial.  But on this record, a reasonable jury could conclude that the relevant market is confined to higher-end jewelers like Neiman Marcus, rather than every seller of precious stones in the world.  *See Coastal Abstract*, 173 F.3d at 735  (noting that jury's finding about the contours of the "relevant purchasing public" was supported by substantial evidence).

At this stage, the record supports a potential finding that Goldstein communicated with a sufficiently large proportion of that market.  In addition to the flurry of communications with the department stores referenced above, RCI also points to Goldstein's acknowledgment that he reached out to "every customer that was advertising the black jade."  Goldstein Dep. 308:11-12.  Goldstein did not recall the total number of RCI

---

[10] RCI alleges, for example, that various movie stars, including Leslie Mann, Halle Berry, and Taraji P. Henson wore RCI jewelry at the 2018 Academy Awards.  *See* Compl. ¶ 11; *see also* ECF No. 138-2 (images depicting celebrities wearing RCI jewelry).

retail customers he contacted, but said it was a "huge amount of communication."  *Id.* at 369:21-22; *see Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1231 (S.D.N.Y. 1991) (invoking defendant's admission that he "talked to hundreds of people.  I talk to a lot of people.").  This "huge amount" of communication was large enough, indeed, that Goldstein needed help identifying the universe of retailers he proceeded to communicate with.  *See* Goldstein Dep. 328:20-329:17.

A reasonable jury could find that this campaign reached enough of the relevant market to constitute "commercial advertising or promotion" under the Lanham Act (especially "promotion" — *see Fashion Boutique,* 314 F.3d at 57).  *See also Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996) (evidence of dissemination sufficient where statements were made to eleven out of seventy-four potential customers)*; Nat'l Artists,* 769 F. Supp. at 1230 (holding that communications to ten current — and a number of former — clients out of "30, maybe 30-plus" clients total constituted commercial promotion).

For the reasons set forth above, both parties' motions for summary judgment on the Lanham Act false-advertising claim are denied in their entirety.

2.   Trademark Infringement under the Lanham Act

Goldstein acknowledges that he posted photographs of RCI's jewelry on Kings Stone's Instagram feed.  *See* Goldstein

Dep. 132:25-133:4 ("I put [the Roberto Coin images] on my Instagram page . . . ."); *id.* at 133:18-134:4 (confirming the Instagram use); Kings Stone Dep. 221:3-6 (same); *id.* at 222:11-18 (Goldstein posted the Instagram images at the "suggestion" of his friend).  Superimposed on these photos was RCI's trademarked logo — the letters "RC" with a diamond shape beside them.  *See* ECF No. 138-4 (trademarks); ECF No. 138-5 (Instagram posts). Goldstein used these materials to promote Kings Stone's black-jade business.  *See, e.g.*, Goldstein Dep. 132:25-133:3; *cf.* Kings Stone Dep. 221:18-25 (claiming that the RCI images were up on Kings Stone's Instagram feed only for a "week, a few more days than that, but not much more, as I recall").  Goldstein also acknowledges that he reproduced images of RCI jewelry in a PowerPoint presentation he sent to various vendors in an effort to drum up business.  *See* Goldstein Dep. 133:22-134:10 (admitting that Kings Stone sent RCI materials via email to "various vendors" in an effort "to promote for business"); *see also id.* at 356:14-357:15; Kings Stone Dep. 222:22-223:13.

RCI claims that these uses constitute trademark infringement.  Goldstein argues that he had authorization to use RCI's marks based on an oral agreement he reached with Roberto Coin (personally) as part of the deal to supply black jade to RCI.  *See* Goldstein Dep. 133:3-17; 355:23-359:14.

To prevail on a claim of trademark infringement under the Lanham Act, a plaintiff must establish that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services, (5) without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005). The parties do not dispute the first four factors; the sole issue is whether Goldstein had RCI's consent to use its marks as he did.

Goldstein testified that Roberto Coin authorized him personally to use RCI's "name as a reference, my product as a reference for the black jade," Goldstein Dep. 357:16-358:15, in exchange for Goldstein providing a "severe discount" on stones. *Id.* at 132:11-23, 357:16-21 (Q. "Just so that I am understanding, is it your claim that you had a perpetual license to use Roberto Coin, Inc. jewelry and trademarks to market Kings Stone black jade?" A. "For the black jade that I had supplied him, absolutely."). Goldstein further testified that the exchange of a discount for such a license is a "common industry practice." *Id.* 132:2-16.

Goldstein's assertion of consent is skeletal, at best. He does not offer any specific evidence, for example, of what Roberto Coin said or did to manifest his agreement to this

37

perpetual license — a sizeable concession on behalf of a
business whose value resides largely in its intellectual
property.  Goldstein does not indicate the territorial scope of
the license.  And it strains credulity to think that the parties
agreed on the duration of the trademark license — specifically,
that it would exist in perpetuity — without any corresponding
agreement on the period of time for which RCI and its affiliates
would purchase stones from Goldstein (a period that, in the end,
lasted only about a year).

     In any event, however, Goldstein's assertion that he
had Roberto Coin's permission to use RCI trademarks in
perpetuity founders on the shoals of the Statute of Frauds —
irrespective of any credulity issues.  "Because there are no
distinctive federal rules for how parties reach contracts
concerning copyrights, *see T.B. Harms Co. v. Eliscu*, 339 F.2d
823 (2d Cir. 1964) (Friendly, J.), oral licenses and oral
terminations are valid to the extent allowed by state statutes
of frauds." *Vincent v. City Colleges of Chicago,* 485 F.3d 919,
922 (7th Cir. 2007); *see also Full Circle United, LLC v. Skee-
Ball, Inc.*, No. 11-CV-5476, 2014 WL 12829195, at *6 (E.D.N.Y.
May 13, 2014) (Bloom, M.J.) (applying New York Statute of Frauds
to alleged agreement to grant plaintiff a license to use
defendant's trademark); *Patsy's Italian Restaurant, Inc. v.
Banas,* 508 F. Supp. 2d 194, 220 (E.D.N.Y. 2007) (oral agreement

to share trademark rights would be "unenforceable because it violates the Statute of Frauds," "even assuming" the existence of such an agreement).

Because the alleged perpetual license agreement could not "be performed within one year from the making thereof," *see* New York General Obligations Law § 5-701, it is subject to the Statute of Frauds' requirement that it be reduced to (or evidenced by) a signed writing. *See id.*; *Full Circle*, 2014 WL 12829195, at *7 (perpetual trademark license must be reduced to writing under New York statute of frauds). The only way this agreement could be fully performed within a year would be for Goldstein to breach the agreement or agree to terminate it. Neither of those possibilities preclude the Statute's application. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 105 (2d Cir. 2009) (oral agreement that "called for performance of an indefinite duration and could only be terminated within one year by its breach during that period" still "fell within the Statute of Frauds and was void") (cleaned up); *Zaitsev v. Salomon Bros.*, 60 F.3d 1001, 1003 (2d Cir. 1995) (where an oral agreement's "performance within one year depends upon an act solely within the control of the party seeking to enforce the oral agreement [such as voluntary termination], the Statute of Frauds remains applicable").

Nor can the oral agreement be revived by the doctrine of partial performance.  The New York state courts have generally declined to apply that exception outside the context of real estate contracts, for reasons Judge Roman explained earlier this year in *Feng Xue v. Koenig*, No. 19-CV-7630, 2021 WL 1092503, at *8 (S.D.N.Y. Mar. 22, 2021)*.  See also Mtivity, Inc. v. Off. Depot, Inc*., No. 19-CV-5094, 2021 WL 969124, at *6 (E.D.N.Y. Mar. 16, 2021) (surveying New York state cases and concluding that the partial-performance exception should not be applied to Section 5-701).[11]

Following oral argument, Goldstein submitted a letter (at the Court's request) on the Statute of Frauds issue, ECF No. 150 (Letter dated September 27, 2021), in which he suggests that the perpetual license agreement actually was reflected in a

---

[11] Even if CKC's agreement to purchase gems from Kings Stone is subject to the New York Uniform Commercial Code as a contract for the sale of goods, the partial-performance exception of N.Y. UCC § 2-201(3)(c) would not revive the alleged trademark license.  The UCC's statute of frauds (in N.Y. UCC § 2-201) applies to contracts that involve the sale of goods in excess of $500.  Under Section 2-201(3)(c), the doctrine of partial performance can render oral contracts in that category "enforceable . . . with respect to goods for which payment has been made and accepted."  By its terms, therefore, the UCC exception can render the oral agreement enforceable only "with respect to goods [*i.e.*, gems] for which payment ha[d] been made and accepted" – not with respect to trademark use that occurred long after the final delivery of Kings Stone's gems to CKC.  *See Dallas Aerospace, Inc. v. CIS Air Corp*., 352 F.3d 775, 782 (2d Cir. 2003) (partial performance exception in 2-201(3)(c) applies only "where the parties" — plural — "have already performed their obligations under the alleged contract," and "only to the extent of such partial performance").  The rationale of Section 2-201(3)(c) is that the receipt and payment for goods constitutes "unambiguous overt admission *by both parties*" that the contract in question exists.  *Id.* (emphasis added).  That is clearly not the case here – there is nothing about CKC's payment for Kings Stones' gems that could even conceivably serve as an unambiguous, overt admission that RCI granted the perpetual license at issue.

40

written writing.  Goldstein's letter references two CKC Purchase Orders memorializing a "discount price" from Kings Stone (of $8 per carat (instead of $24).  *Id.* (citing ECF No. 135).  His letter also attaches an email from Roberto Coin to Goldstein, in which Coin states that the "RC brand will bring you lots of credibility in the market."  *Id.*

These materials are insufficient to satisfy Section 5-701's requirement of a written "note or memorandum" evidencing the oral agreement.  In New York, "the well-established rule" is that a "memorandum sufficient to meet the requirements of the Statute of Frauds must contain expressly or by reasonable implication all the material terms of the agreement."  *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575 (1969).  The note or memorandum must set forth these essential terms "with the requisite definiteness."  28 Glen Banks, *New York Contract Law* § 3:17, at 170 (2d ed. 2017); *see also Alkholi v. Macklowe*, --- F. App'x ----, 2021 WL 1731814, at *2 (2d Cir. May 3, 2021) (citing *Morris*, 23 N.Y.2d at 575); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 748 (2d Cir. 1998) (note or memorandum that "omits or incorrectly states" certain terms of alleged oral agreement may still be invoked, but only to enforce the terms "shown in such writing").  Here, the writings to which Goldstein refers contain no express reference

to the perpetual trademark license he alleges, and nothing to "reasonably imply" an agreement to confer such a license.[12]

Because Goldstein has admitted his use of RCI's trademark, and his claim to authorization for such use is barred by the Statute of Frauds, there is no remaining dispute of material fact on RCI's federal trademark infringement claim. Summary judgment on liability is therefore granted to RCI on Counts Six and Seven of its complaint.[13]

Plaintiff seeks damages including "enhanced" statutory damages, on the ground that Defendants' infringement was

---

[12] It is not clear from Goldstein's submission that the email and purchase orders he invokes were made part of the record in discovery which closed on January 20, 2020. *See* Minute Entry dated July 31, 2019; *see e.g.*, *Bedasie v. Mr. Z Towing, Inc.*, No. 13-CV-5453, 2016 WL 7839436, at *3 (E.D.N.Y. Apr. 29, 2016) (Pollak, M.J.) (declining to consider evidence produced after the close of discovery where defendants "offered no explanation for their failure to produce these documents at any earlier point in the litigation"); *Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp. 2d 409, 435 n.25 (E.D.N.Y. 2012) (suggesting that letter "not contained in the record" should not be considered as substantive evidence). In any event, they are insufficient because they do not refer to any trademark license, let alone a perpetual one. *See* Banks, *supra*, at 172 ("Emails may not satisfy the Statute if the writings expressly, or by implication, do not contain the material terms of the alleged oral agreement.").

[13] RCI also brings a Lanham Act claim for unfair competition (also known as "false designation of origin"). "[I]t is well settled that the standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for trademark infringement claims under Section 32 (15 U.S.C. § 1114)." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002). Because the Court has granted summary judgment in favor of RCI for trademark infringement under the Lanham Act, it also grants summary judgment in RCI's favor on its unfair competition claim under the Lanham Act. *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 382, 384 (S.D.N.Y. 2015) (granting summary judgment on both Lanham Act unfair competition claim and Lanham Act trademark-infringement claim under the same analysis).

willful.  Enhanced statutory damages — of "not more than
$2,000,000" per mark per type of good — are available in cases
of willful infringement.  Here, the question of damages
(including willfulness) is properly reserved for a jury rather
than resolved on summary judgment.  *See Yurman Studio, Inc. v.
Castaneda*, 591 F. Supp. 2d 471, 504 (S.D.N.Y. 2008) ("Because
these assertions raise a genuine dispute as to defendants'
willfulness, neither an enhanced damages award nor an award of
costs and attorneys' fees are appropriate at this time, nor can
summary judgment be granted to defendants on the issue of
willfulness.").  "Courts are generally reluctant to dispose of a
claim on summary judgment when mental state is at issue," though
it is permissible to do so in certain circumstances.  *Church &
Dwight Co. v. Kaloti Enters. of Michigan, L.L.C.*, 697 F. Supp.
2d 287, 291–92 (E.D.N.Y. 2009), *vacated on other grounds*, No. 7-
CV-0612, 2011 WL 4529605 (E.D.N.Y. Sept. 28, 2011); *see also
U.S. Media Corp. v. Edde Ent., Inc.*, No. 94-CV-4849, 1996 WL
520901, at *1 (S.D.N.Y. Sept. 12, 1996) (Dolinger, M.J.)
(granting summary judgment to plaintiff as to liability on
copyright infringement and unfair competition claims, but
denying summary judgment on willfulness issue).  RCI also seeks
injunctive relief, in addition to money damages.

    RCI also brought a state trademark infringement claim
under New York General Business Law § 360-k.  "State law claims

for trademark infringement are analyzed concurrently with the federal trademark infringement claims as the standards are substantially similar." *City of New York v. Blue Rage, Inc.*, 435 F. Supp. 3d 472, 486 n.8 (E.D.N.Y. 2020); *see also Smith v. Mikki More, LLC*, 59 F. Supp. 3d 595, 616 (S.D.N.Y. 2014) ("A claim of trademark infringement under New York law requires proof of the same elements and can be analyzed together with a Lanham Act claim." (citing N.Y. Gen. Bus. Law § 360-k)). Therefore, summary judgment is granted to Plaintiff on this ground as well. *See OptionsXpress, Inc. v. OptionsXpress Inc.*, No. 14-CV-956, 2014 WL 3728637, at *2 (S.D.N.Y. July 28, 2014) ("Because the analysis for trademark infringement under New York common law is the same as federal trademark analysis, the foregoing establishes liability under GBL § 360-k."). No damages will be awarded on the state claim, however, to the extent duplicative of any award under the federal claim. *Johnson & Johnson v. Azam Int'l Trading*, No. 07-CV-4302, 2013 WL 4048295, at *15 (E.D.N.Y. Aug. 9, 2013).

RCI is directed to submit a letter setting out its proposed next steps on the trademark infringement and unfair competition claims, including with respect to any entry of judgment and to RCI's request for injunctive relief. This letter shall be submitted or before October 20, 2021. Goldstein is directed to respond to this letter by November 14, 2021.

44

3.   <u>Defamation and Trade Disparagement</u>

RCI also brings various state-law claims including defamation and trade disparagement.  These two claims are predicated on the same allegedly false statements that underly RCI's Lanham Act false-advertising claim.

To prove defamation under New York law, a plaintiff must show that the defendant made a statement that was: (1) false, defamatory, and of and concerning the plaintiff; (2) published to a third party; (3) made with the applicable level of fault; and (4) defamatory *per se* or that caused the plaintiff "special" harm.  *See Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011).  In the commercial context, "false statements attacking the integrity or credit of a business" amount to defamation *per se*.  *Fashion Boutique*, 314 F.3d at 59. Of course, "truth is an absolute defense to a defamation claim." *Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir. 2015).

To recover for trade disparagement, a plaintiff "must show that the defendant published an oral, defamatory statement directed at the quality of a business's goods and must prove that the statements caused special damages." *Fashion Boutique*, 314 F.3d at 59.  "Where loss of customers constitutes the alleged special damages, the individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized." *Id.*  Here, as set forth above, RCI has

adduced evidence sufficient for a jury to find special damages proved, based on lost customers and revenue.

As in the Lanham Act context, a defendant may be held liable for defamation and trade disparagement under New York law even if his statements are merely impliedly false.  *See, e.g.*, *Martin*, 777 F.3d at 552 ("[I]n certain circumstances even a technically true statement can be so constructed as to carry a false and defamatory meaning by implication or innuendo."). Nevertheless, "a plaintiff alleging defamation by implication must show that Defendants affirmatively intended such implication." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 465–66 (S.D.N.Y. 2012).

As explained in the false-advertising discussion above, questions of fact remain as to the falsity of Goldstein's statements concerning the authenticity and prior authentication of RCI's black jade.  Therefore, both Plaintiff's and Defendant's motions for summary judgment are denied.

4.   Tortious Interference with Business Relations

To prove its claim for tortious interference with business relations under New York law, RCI must demonstrate: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant . . . used dishonest, unfair, or improper means; and (4) the defendant's interference caused

injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003).

The parties generally dispute the third element – namely, whether Defendants employed improper means in their dealings with RCI's customers. *See Scutti Enters. v. Park Place Ent. Corp.*, 322 F.3d 211, 216 (2d Cir. 2003) (under New York law, improper means include fraud or misrepresentation, among other things). RCI argues that the wrongful means were the "misrepresentations [directed] both broadly and toward RCI's largest customers to maximize the economic impact of their interference with RCI's business relationships," as well as the improper threats of litigation. Pl. Br. at 31. As described above, issues of fact remain as to Goldstein's alleged misrepresentations.

Issues of fact also remain as to whether Goldstein improperly threatened customers with litigation. "[A] lawsuit or the threat of a lawsuit is wrongful [for purposes of a tortious interference claim] if the actor has no belief in the merit of the litigation." *Universal City Studios, Inc. v. Nintendo Co., Ltd*. 797 F.2d 70, 75 (2d Cir. 1986). "It is also wrongful if the actor, having some belief in the merit of the suit, nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication."

47

*Id.*  The record contains emails showing Goldstein expressing disdain for RCI, *see* ECF No. 138-8 at 2, as well as Goldstein's allegedly long history of threatening legal action.  *See* Declaration of Gayle Pollack (Counsel to RCI) dated Feb. 7, 2020 ¶¶ 13-19, ECF No. 138-21, and attached Exhibits, ECF Nos. 138-33, 34, 35, 36, and 37 (relating alleged threats of legal consequences — both civil and criminal — that Goldstein made to various counterparties in the past).  Based on this, Goldstein's motion for summary judgment on this claim is denied. Plaintiff's motion on this claim is also denied.

    5.   <u>New York General Business Law Section 349</u>

        RCI also brings a claim under GBL Section 349 for deceptive acts and practices.  A successful GBL Section 349 claim requires that a plaintiff prove that (1) "the defendant has engaged in an act or practice that is deceptive or misleading in a material way"; (2) the "plaintiff has been injured by reason thereof"; and (3) the deceptive act or practice is "consumer oriented."  *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343-44 (1999).  In contrast to "[p]rivate contract disputes, unique to the parties," consumer-oriented conduct within the meaning of the statute requires acts or practices that "have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995).  Therefore, regardless of the deceptive

act, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Mayes v. Summit Ent. Corp.*, 287 F. Supp. 3d 200, 208 (E.D.N.Y. 2018); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("The critical question, then, is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or competitor."). Accordingly, "courts routinely reject such attempts to fashion Section 349 and 350 claims from garden variety disputes between competitors." *Edward B. Beharry & Co. v. Bedessee Imps., Inc.*, No. 09-CV-077, 2010 WL 1223590, at *9 (E.D.N.Y. Mar. 23, 2010).

Here, RCI's complaint reveals a dispute between it and a competitor, even if it is not properly labeled garden-variety. *See Something Old, Something New, Inc. v. QVC, Inc.*, No. 98-CV-7450, 1999 WL 1125063, at *12 (S.D.N.Y. Dec. 8, 1999) ("A deliberate effort by one competitor to destroy the other's business is not considered a harm to the public interest."). RCI's complaint focuses almost entirely on the damage to RCI's business, and not to the "consuming public at large"; it has adduced no specific evidence that the "public interest [wa]s harmed" by Defendants' actions. *Halo Optical Prod., Inc. v. Liberty Sport, Inc.*, No. 14-CV-0282, 2017 WL 1082443, at *17 (N.D.N.Y. Mar. 22, 2017); *cf. Securitron*, 65 F.3d at 264-65 (GBL Section 349 claim established where the defendant intentionally

49

made false statements regarding a competitor's product to a regulatory agency, with potential consequences for public safety).  Plaintiff's GBL Section 349 claim is therefore dismissed.[14]

## IV. Conclusion

For the foregoing reasons, the motion to dismiss Kings Stone's counterclaims for failure to prosecute is granted and the motion for default judgment is denied without prejudice. Plaintiff's motion for summary judgment on its claims for trademark infringement and unfair competition are granted as to liability.  The parties are directed to submit the letters discussed above concerning next steps on the trademark infringement and unfair competition claims.  Plaintiff's motion for summary judgment is otherwise denied.  Defendant's motion for summary judgment on Plaintiff's GBL Section 349 claim is

---

[14] Plaintiff contends that "[t]he analysis of a claim under GBL § 349 tracks the Lanham Act," Pl. Br. at 27, but as set forth above, there are important differences.  *See Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 446 (S.D.N.Y. 2020) ("While the elements for alleging false advertising and infringement under the General Business Law are otherwise similar to Lanham Act claims, a non-consumer plaintiff must allege conduct that has significant ramifications for the public at large."); *Feel Better Kids, Inc. v. Kids in Need, Inc.,* No. CV-06-0023, 2012 WL 4483000, at *9 n. 12 (E.D.N.Y. Aug. 28, 2012), *report and recommendation adopted*, No. 6-CV-23, 2012 WL 4483874 (E.D.N.Y. Sept. 27, 2012) ("Unlike the New York General Business Law false advertising statutes which are consumer protection statutes, the Lanham Act is meant to prevent competitive harm; thus, there is no requirement that the Plaintiffs allege public harm in order to have standing to bring a Lanham Act false advertising claim.").

granted; Defendant's motion for summary judgment is otherwise

denied.


　　　　　SO ORDERED.



　　　　　　　　　　　　　　　/s/ Eric Komitee
　　　　　　　　　　　　　　　ERIC KOMITEE
　　　　　　　　　　　　　　　United States District Judge


Dated:　　September 30, 2021
　　　　　Brooklyn, New York